J-A10035-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| 2019 E. BOSTON ST., LLC | : | IN THE SUPERIOR COURT |
| | : | OF |
| Appellant | : | PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VIKING MILL ASSOCIATES, LLC | : | |
| | : | No. 1225 EDA 2025 |

Appeal from the Order Entered May 6, 2025
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  221001283

BEFORE:   STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                     **FILED MAY 15, 2026**

Plaintiff/Appellant, 2019 E. Boston St., LLC, appeals from the order entered on May 6, 2025, in the Court of Common Pleas of Philadelphia County granting summary judgment in favor of Defendant/Appellee, Viking Mill Associated, LLC. After a careful review, we affirm.

The relevant facts and procedural history are as follows: This dispute arose over the sale of commercial real estate being purchased by Appellant, 2019 E. Boston St., LLC, and being sold by Appellee, Viking Mill Associated, LLC. The parties entered into a purchase and sale agreement ("PSA") on September 2, 2021. **See** R.R. 43a, Exhibit B. The property at issue was occupied by tenants whose leases would be transferred to Appellant upon

_____

[*] Former Justice specially assigned to the Superior Court.

closing. The property contained a North building and a South building. Appellant planned to begin demolition of the South building and redevelopment of the North building following its purchase and the vacancy of all tenants. Appellant's Br. at 9.

Pursuant to the PSA, Appellee agreed to provide an accurate copy of a "rent roll" to Appellant on the day prior to closing. R.R. 53a. The rent roll is a document listing the existing leases on the property, the expiration dates of each lease, the rent due under each lease, and whether each lease required a 30-day or 90-day termination notice. Although Appellee provided a timely rent roll to Appellant, it is undisputed that the rent roll was inaccurate. *See* Tr. Ct. Op. at 5, Appellant's Br. at 19-20, Appellee's Br. at 17. The largest tenant of the property, "Urban Axes", was a recreational axe throwing business located in the South building. R.R. 95a. On April 21, 2022, Appellee had modified the lease with Urban Axes to reflect a 90-day lease termination notice provision without informing Appellant. R.R. 95a; R.R. 72a. At the time of closing when Appellee provided Appellant the rent roll, Urban Axes was listed as having a month-to-month tenancy, requiring a 30-day notice of termination, as opposed to its 90-day termination under the modified lease. R.R. 136a. Relevantly, however, there were three tenants listed on the rent roll who did have a 90-day notice of termination provision. *Id*.

The leases for those three tenants, as well as the lease for Urban Axes, were each renewed by Appellee without the knowledge or approval of

Appellant within the year prior to closing. Under the PSA, Appellee was not to modify, renew, or expand any leases during the "review period" without Appellant's approval.[1] R.R. 58a. Upon learning that Appellee had renewed leases during the review period, Appellant had the right to terminate the PSA and seek remedies. Despite this option, Appellants decided to close on the property. Closing occurred on August 31, 2022, and the PSA merged into the deed.[2] On the same day, all existing tenants were given notice that their leases were being terminated in accordance with the terms of their respective leases. Appellant inexplicably shut off the water to the properties on September 5, 2022, but turned it back on after complaints from the tenants.[3]

A week after closing, on September 7, 2022, a concerned group of the property's tenants invited Appellant's President, Jay Freebery, to a meeting. Multiple tenants who received 30-day termination notices expressed that they were unable or unwilling to vacate the property by September 30, 2022, and

---

[1] The "Review Period" began on September 7, 2021. **See** R.R. 58a. The four leases with a 90-day notice of termination provision were renewed/modified on the following dates: November 1, 2021, January 1, 2022, April 1, 2022, and April 21, 2022.

[2] "The doctrine of merger provides that as a general rule an agreement of sale merges into the deed and no recovery may be had based upon an earlier agreement." **Sensenig v. Greenleaf**, 325 A.3d 654, 660 (Pa. Super. 2024).

[3] Appellant was aware that the majority of tenants still had twenty-five days remaining on their leases, and that four tenants had seventy-five days remaining on their leases. It is inexplicable to us that Appellant would shut off the utilities so early. This event caused tenants to complain and could have been a cause of the tenants' unfavorable impression of Appellant and consternation about the situation.

that they were going to holdover beyond that date. *See* Freebery Deposition, 6/26/24, at 72. Some argued that, like Urban Axes, they should be given ninety days to vacate, despite having no legal entitlement to any more time than the thirty days in their leases. *Id*. President Freebery testified that the theme of the tenants' arguments was that if Urban Axes doesn't have to leave, neither do they. *Id.* at 73. One tenant in the South building, Peter Steliga, asserted to President Freebery that he should have the same right to amend his lease as Urban Axes. *Id.* at 79. In fact, Mr. Steliga was quoted in an article about the artist community on the property saying that his understanding was that he "could stay as long as [he] wanted," despite being contractually bound to a month-to-month lease. R.R. 136b.

Feeling the pressure from the tenants, Appellant voluntarily extended the lease of all the month-to-month tenants from September 30 to October 31, 2022 as an accommodation, despite the tenants having no legal entitlement to this arrangement. N.T., 6/25/24, at 162. Thereafter, Appellant again voluntarily extended the leases to November 30, 2022. *Id.* at 177. Urban Axes vacated the South building by the November 30, 2022, deadline. Mr. Steliga, on the other hand, did not vacate the premises until the second or third week of January 2023. *See* R.R. 167b, D-Exhibit 34 (email stating that Mr. Steliga removed most of his items on January 13, 2023, and had until January 19, 2023 to remove the rest of his personal property).

Ultimately, more than twenty-six tenants held over, with Mr. Steliga being the last to vacate more than 100 days after his lease required him to vacate and more than forty days after Urban Axes vacated. The holdovers undoubtedly caused delays to Appellant's construction/demolition plans. Appellant also claimed that it lost business opportunities because of the publicity surrounding the tenant issue. Appellant's Br. at 15. On October 14, 2022, Appellant filed suit against Appellee for breach of contract and fraudulent misrepresentation. Appellant asserted that Appellee breached the PSA by transmitting an incorrect rent roll on August 31, 2022, that did not identify Urban Axes as a tenant with a 90-day termination period, and by certifying that the rent roll was accurate. Appellant further alleged that Appellee committed fraudulent representation by intentionally providing the inaccurate rent roll on the closing date and that Appellant relied on this representation. *See* Compl.

At the conclusion of discovery, the parties filed cross-motions for summary judgment. On May 6, 2025, the trial court granted Appellee's motion and dismissed Appellant's claims. Appellant filed a notice of appeal on May 8, 2025, and filed a 1925(b) concise statement on May 30, 2025. This appeal follows.

Appellant raises the following issues for our review:

1. Did the trial court err in failing to apply the proper standard of review for summary judgment—whether there is a genuine issue as to any material fact—and resolving all doubts as to the existence of a genuine issue of material fact against the moving

party? Specifically, was it an abuse of discretion or an error of law for the Court of Common Pleas to grant summary judgment in favor of Appellee/Defendant and against Appellant/Plaintiff when Appellant/Plaintiff adduced evidence that—when properly reviewed in the light most favorable to Appellant/Plaintiff as the non-moving party, and allowing Appellant/Plaintiff the benefit of every reasonable inference—established that Appellant/Plaintiff suffered damages proximately caused by Appellee/Defendant's breaches?

2. Was it an abuse of discretion or an error of law for the Court of Common Pleas to grant summary judgment in favor of Appellee/Defendant and against Appellant/Plaintiff when the gist of the action doctrine did not prohibit Appellant/Plaintiff from pleading alternative causes of action pursuant to Pennsylvania Rule of Civil Procedure 1020(c) and the gist of the action doctrine did not apply to claims of fraudulent inducement?

Appellant's Br. at 4.

We begin with our standard of review. "This Court's standard of review of a grant of summary judgment is *de novo*, and our scope of review is plenary. We apply the same standard for summary judgment as the trial court." *Gior G.P., Inc. v. Waterfront Square Reef, LLC*, 202 A.3d 845, 852 n.10 (Pa. Cmwlth. 2019) (citing *Cochrane v. Kopko*, 975 A.2d 1203, 1205 (Pa. Cmwlth. 2009)). The court must examine the record in the light most favorable to the non-moving party and resolve all doubts against the moving party. *Stidham v. Millvale Sportsmen's Club*, 618 A.2d 945, 950 (Pa. Super. 1992). On review of a trial court's order granting summary judgment, a reviewing court will affirm unless it is shown that the trial court committed an error of law or abused its discretion. *See Maas v. UPMC Presbyterian Shadyside*, 192 A.3d 1139, 1144 (Pa. Super. 2018). We must consider

whether, in light of the record evidence, there exists a genuine issue of material fact. *See Wright v. Misty Mountain Farm, LLC*, 125 A.3d 814, 818 (Pa. Super. 2015).

Appellant's first issue challenges the court's grant of summary judgment in favor of Appellee. Specifically, Appellant argues that, when viewing the evidence in a light most favorable to it, the element of damages was established. "[T]hree elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *412 N. Front St. Associates, LP v. Spector Gadon & Rosen, P.C.*, 151 A.3d 646, 657 (Pa. Super. 2016) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).

There is no dispute that a contract existed and that Appellee breached it in failing to provide an accurate rent roll. Appellant's Br. at 19-20, Tr. Ct. Op. at 5, Appellee's Br. at 17. Accordingly, we need not discuss those aspects of the case. The dispute lies in whether, viewing the evidence in a light most favorable to Appellant, Appellant established that it incurred damages caused by Appellee's breach. "In order to recover for damages pursuant to a breach of contract, the plaintiff must show a causal connection between the breach and the loss." *Logan v. Mirror Printing Co. of Altoona, Pa.*, 600 A.2d 225, 226 (Pa. 1991).

Appellant argues that it incurred $315,000 in contractor-related damages, $102,350 in lender-related costs, $87,350 in loan extensions, $15,000 in lender monitoring fees, and $343,275/month in lost rental revenue. Appellant's Br. at 21-23. Neither party disputes that Appellant incurred various costs associated with the delay in demolition and construction. Appellee's Br. at 27. However, Appellant argues that these costs were associated with the delay caused by Urban Axes having a 90-day termination provision, Appellant's Br. at 21, while Appellee argues that Appellant provided no evidence that the transmission of the inaccurate rent roll caused the delay and resultant financial harm, and that there are other causes of the harm Appellant suffered. Appellee's Br. at 27.

This Court must determine one specific question: whether Appellant adduced evidence of a causal connection between Appellee's failure to disclose Urban Axes' tenancy with a 90-day termination provision, and Appellant's increase in costs because it could not begin construction until all tenants vacated the property. For the reasons that follow, this Court finds that a causal connection was not established.

Preliminarily, we must clarify two points of the summary judgment standard. First, we note that Appellant indicates in its reply brief that the counterstatement of the facts as stated by Appellee "ignores the controlling standard of review by casting the record in the light most favorable to the [Appellee]." Appellant's Reply Br. at 1. Courts are not required to overlook

facts stated and evidence provided by the moving party. Instead, courts must consider all the evidence presented in the record by both parties, and then, in making a decision to grant or deny summary judgment, must view it in a light most favorable to the non-moving party.

Second, the parties disagree on whether hearsay may be considered as evidence at the summary judgment stage. Appellee's Br. at 29-31; Appellant's Reply Br. at 4, Tr. Ct. Op. at 6. The Pennsylvania Rules of Civil Procedure allow a non-movant to use certain hearsay evidence in opposition to a motion for summary judgment. **Petrina v. Allied Glove Corp.**, 46 A.3d 795, 799 (Pa. Super. 2012). **See also** Pa.R.C.P. 1035.1, 1035.3. A trial court should consider purported hearsay presented by a nonmovant at the summary judgment stage as long as the non-movant can provide a plausible avenue for the admission at trial of the hearsay. **Petrina, supra** at 799. Here, Appellant would plausibly be able to call the tenants to testify at trial, and thus the testimony contained in the depositions of Appellant's representatives regarding the tenants' complaints is admissible. However, the non-moving party may not rest upon averments contained in its pleadings; the non-moving party must demonstrate that there is a genuine issue for trial. **Stidham, supra.**

This Court finds that there can be no reasonable dispute that, regardless of whether or not Urban Axes' 90-day notice of termination provision was included on the August 31, 2022 rent roll, the construction project would have still been delayed. Based on the deposition testimony, the month-to-month

tenants did not seem to appreciate that their lease contained different provisions than that of the four tenants with 90-day termination provisions. **See, e.g.,** Freebery Deposition, 6/26/24, at 72, 73, 79. Despite having no legal right to do so, the month-to-month tenants seemed to believe that they were entitled to violate their leases or to unilaterally extend their leases simply because they thought it was unfair that the leases they signed contained different rights and obligations than the leases that other tenants signed.

For example, an article published about the tenants on the property who were "fighting back" against Appellant states of one of the tenants with a 90-day termination provision, Jackie Riccio, "her lease required a 90-day vacancy notice; as such, she has been organizing with [] other tenants to ensure everyone receives the same." R.R. 136b. Notably, this tenant is not Urban Axes. Further, Mr. Steliga was quoted in the same article saying that his understanding was that he "could stay as long as [he] wanted" despite being contractually bound to a month-to-month lease. **Id**. Accordingly, there is no genuine issue for a jury to decide; even if the rent roll provided by Appellee on August 31, 2022 was accurate, there is no evidence that it would have prevented the tenants from violating their leases. The tenants violating their leases was a leading cause in the delay in construction.

Further, Appellant made a business decision to extend the month-to-month tenants' leases from September 30 to October 31 and then to November 30, 2022. Appellant was under no obligation to do so and

gratuitously made this decision to foster goodwill and calm tensions under pressure from the tenants. Accordingly, even if the August 31, 2022, rent roll was accurate, Appellant has not asserted that it would not have extended any of the month-to-month tenants' leases to ease tensions and combat bad publicity. Appellant voluntarily extending the leases may have been a cause in the delay in construction.

More importantly, the longest holdover tenant was Mr. Steliga, not Urban Axes. Both Mr. Steliga and Urban Axes were tenants of the South building which Appellant planned on demolishing once all the tenants vacated. Mr. Steliga held over 100 days past his lease termination and over forty days beyond Urban Axes. Thus, even if the August 31, 2022, rent roll was accurate, Appellant has not provided any proof that Mr. Steliga would not have held over until January 2023. Accordingly, Mr. Steliga's violation of his lease caused the delay in construction and in turn, caused the costs and damages.

Here, the trial court decided that Appellant failed to point to evidence that the specific failure to include Urban Axes on the final rent roll proximately caused its damages because Appellant was aware that other tenants also had the right to stay until November 30, 2022. Tr. Ct. Op. at 5-6. Additionally, despite the rent roll being inaccurate, Appellee informed Appellant by phone on the day of closing that there was an additional tenant with a 90-day notice of termination provision. *Id.* at 3, 6. The trial court further stated the following:

- 11 -

Mr. Duffy [Appellant's CEO] also responded, when asked if Urban Axes had had a 30-day termination period, none of the other tenants would have held over, "No, I didn't say that." (***Id.***, p.177:24-178:4. Additionally, he would not assert that Peter Steliga, who held over the longest, would have left earlier had it not been for Urban Axes' extended termination period. ([Duffy Deposition] at 178:21-179:1.) Mr. Freebery also would not speculate that Mr. Steliga would have left on September 30 if Urban Axes had, noting that he was an "interesting character." (Deposition of Jay Freebery, p. 95:7-10, exhibit 7 to [Appellee's] motion.) Mr. Steliga ultimately remained longer than Urban Axes or any other tenant. Finally, [Appellant] has not produced evidence showing that Urban Axes' tenancy was the cause of other tenants holding over, rather than the tenancy of, for example, Jackie Riccio.

[Appellant] argues that Urban Axes' presence in the South Building of the property caused a separate problem than the tenants in the North Building, because had the South Building been unoccupied, it could have demolished that building and kept the North Building open. The parties dispute whether this would have been possible, due to features of the water supply. However, it is not relevant, because Mr. Steliga was also a tenant in the South Building. Mr. Steliga held over the longest, until January 2023. His presence in the building kept [Appellant] from demolishing it, and [Appellant] has not adduced evidence that Mr. Steliga would have left earlier had Urban Axes done so.

[Appellant] has not pointed to evidence that Urban Axes' extended termination period caused other tenants to hold over, nor that [Appellee's] failure to disclose that termination period in the rent roll on August 31, 2022 did so. Without any evidence that [Appellee] caused [Appellant's] damages, the [c]ourt must grant summary judgment to [Appellee].

Tr. Ct. Op. at 6-7.

We agree. In other words, even when accepting all of Appellant's contentions as true and considering hearsay evidence presented at the depositions, Appellant still cannot prevail. The trial court did not err or abuse

- 12 -

its discretion in granting summary judgment as to Appellant's breach of contract claim.

Appellant's second issue is that the trial court erred in applying the gist of the action doctrine to Appellant's fraudulent misrepresentation claim. "The gist of the action doctrine prohibits a plaintiff from re-casting ordinary breach of contract claims into tort claims." ***B.G. Balmer & Co. v. Frank Crystal & Co., Inc.***, 148 A.3d 454, 468 (Pa. Super. 2016).

> Under Pennsylvania law, a cause of action framed as a tort but reliant upon contractual obligations will be analyzed to determine whether the cause of action properly lies in tort or contract. In general, courts are cautious about permitting tort recovery based on contractual breaches. In keeping with this principle, this Court has recognized the gist of the action doctrine, which operates to preclude a plaintiff from re-casting ordinary breach of contract claims into tort claims. Where fraud claims are intertwined with breach of contract claims and the duties allegedly breached are created and grounded in the contract itself, the gist of the action is breach of contract. Thus, claims of fraud in the performance of a contract are generally barred under the gist of the action doctrine.

***Autochoice Unlimited, Inc. v. Avangard Auto Fin., Inc.***, 9 A.3d 1207, 1212 (Pa. Super. 2010) (citations, quotation marks, and emphasis omitted).

This Court recently examined the "gist of the action doctrine" and clarified that a plaintiff may

> freely elect their remedy and sue in either contract or tort, when the facts supported both forms of action. Today, the Rules of Civil Procedure allow a plaintiff to plead both tort and contract claims in the same lawsuit.
>
> After ***Bruno [v. Erie Insurance Co.***, 106 A.3d 48 (Pa. 2014)], Pennsylvania courts must review each claim individually to determine whether the plaintiff has alleged or offered sufficient

proof (depending on the stage of the proceedings) that the defendant breached the particular duty (tort or contractual) for each particular claim.

**Swatt v. Nottingham Vill.**, 342 A.3d 23, 52 (Pa. Super. 2025).

Guided by the above principles, we must determine if Appellant made sufficient allegations to the particular claim of fraudulent misrepresentation, or if it was merely a recasting of its breach of contract claim. The Pennsylvania Supreme Court has found that fraudulent misrepresentation exists where there is: "(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result." **Martin v. Lancaster Battery Co.**, 606 A.2d 444, 448 (Pa. 1992). If Appellant failed to raise any genuine issue of material fact as to any element of fraudulent misrepresentation, the trial court's grant of summary judgment was proper.

Here, Appellant argues that Appellee falsely represented to Appellant that Urban Axes has a 30-day termination provision, which induced Appellant to close on the transaction. Appellant's Br. at 35. Appellant claims that Appellee misled it, causing it to overpay for the property. **Id.** at 36. However, Appellant has no claim as to Appellee having extended Urban Axes' lease without its approval. **See** n.2, **infra**. Thus, Appellant's claim relies on the fact that Appellee provided an inaccurate rent roll on the day of closing, *i.e.*, that Appellee acted fraudulently in the performance of the contract. **See** Compl. at

¶¶ 42-44. Appellee's duty to have accurately included Urban Axes' 90-day termination on the rent roll was purely a function of the parties' contract.

Additionally, Appellant cannot produce evidence that its damages were a proximate result of its reliance on the rent roll. If Urban Axes had been the only tenant with a 90-day termination provision and the rent roll provided that *all* tenants had a month-to-month tenancy, and Appellant, relying on the fact that all tenants would vacate within thirty days, scheduled its contractors and construction plans, Appellant would have better footing under this argument. In that scenario, while other tenants still may have held over, Appellant would have detrimentally relied on Appellee's representation that the entire property *should* have been vacant of tenants by September 30, 2022, when in fact Urban Axes had the right to stay until November 30, 2022. However, that is not what happened here. Appellant knew that at least three tenants had until November 30, 2022 to vacate and still closed on the property. Thus, the reliance on the misrepresentation that Urban Axes had a month-to-month tenancy cannot be said to have proximately caused Appellant's damages.

Based on the foregoing, we affirm the trial court's grant of summary judgment as to both of Appellant's claims.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>5/15/2026</u>